**FAMILY FARM ALLIANCE, Plaintiff,**

v.

**Kenneth Lee SALAZAR, as Secretary of the United States Department of the Interior, et al., Defendants.**

**No. 1:09–CV–01201 OWW.**

United States District Court,
E.D. California.

Oct. 26, 2010.

Brenda Washington Davis, Leslie R. Wagley, The Brenda Davis Law Group, Sacramento, CA, Gary William Sawyers, Sawyers & Holland, Fresno, CA, for Plaintiff.

Ethan Carson Eddy, U.S. Dept. of Justice, Wildlife & Marine Resources Section, James A. Maysonett, Department of Justice, Washington, DC, for Defendants.

**MEMORANDUM DECISION RE CROSS MOTIONS FOR SUMMARY JUDGMENT ON CLAIMS TWO AND THREE (DOCS. 54 & 60)**

OLIVER W. WANGER, District Judge.

## I. INTRODUCTION

Before the Court for decision are cross motions for summary judgment on two of Plaintiff's, Family Farm Alliance's ("FFA"), three claims.[1] The Second Claim alleges that Defendant, Kenneth Salazar, Secretary of the United States Department of the Interior, through the United States Fish and Wildlife Service ("FWS") failed to timely respond to FFA's appeal filed under the Information Quality Act ("IQA"), Pub. L. No. 106–554, § 515(a) (2000), 44 U.S.C. § 3516, and Guidelines issued by the Office of Management and Budget ("OMB") and FWS to implement the IQA. That appeal disputed FWS's IQA compliance in connection with FWS's issuance of a 2008 Biological Opinion under the Endangered Species Act ("ESA"), addressing the impact of the coordinated operations of the federal Central Valley Project ("CVP") and State Water Project ("SWP") on the threatened Delta smelt (*hypomesus transpacificus*) ("2008 Smelt BiOp"). The Third Claim alleges that the peer review FWS commissioned to review the 2008 Smelt BiOp violated National Academy of Sciences ("NAS") standards governing peer reviewer conflicts of interest, incorporated by reference into FWS's IQA Guidelines.

FFA moves for summary judgment, arguing: (1) its IQA claims are judicially reviewable; (2) it has standing to maintain these claims in federal court; and (3) it is entitled to judgment on the merits of its Second and Third claims. Doc. 54. Federal Defendants filed a combined cross

---

1. The First Claim for Relief has been consolidated with the claims in the *Delta Smelt Consolidated Cases,* 1:09–cv–00407. Cross motions on all consolidated claims in the *Delta Smelt* cases have been separately submitted for decision.

motion/opposition, arguing: (1) Plaintiff lacks standing; (2) there is no right to judicial review of Plaintiff's IQA claims; (3) the Second Claim is moot because FWS responded to FFA's appeal; and, in the alternative, (4) Federal Defendants are entitled to summary judgment on the merits. Doc. 61. FFA filed a combined reply/opposition. Doc. 67. Federal Defendants replied. Doc. 68.

## II. *FACTUAL BACKGROUND*

On December 14, 2008, FFA submitted to FWS a "Request for Correction" of information in the draft effects analysis of the 2008 Smelt BiOp ("Request"), which asserted that the 2008 Smelt BiOp did not comply with the IQA and the ESA and requested that the 2008 Smelt BiOp be withdrawn and corrected under the IQA. The Request contained twenty-five specific demands, including but not limited to primary requests that: (1) assumptions contained in the analysis regarding the decline in Delta smelt be replaced with actual data and analysis supporting those assumptions; (2) all statements, assumptions, and assertions which are not supported by the best available scientific data and/or are contradicted by data and analysis be removed and replaced with statements that are supported by the best available scientific data and analysis; (3) all statements which are predicated on speculation, hypothesis, or supposition, rather than data, be removed; (4) the degree of uncertainty regarding the cause of the decline of delta smelt be fully disclosed; (5) well-supported data and analysis which demonstrates that water project pumping operations have no important effects on abundance of delta smelt be acknowledged; and (6) the 2008 Smelt BiOp be appropriately peer reviewed. *See* Request, AR 200001–200018.

On December 23, 2008, FWS sent FFA an interim response, acknowledging receipt of the Request on December 15, 2008. AR 800195. On March 12, 2009,

seventy-nine days after FWS confirmed receipt of the Request for Correction, FWS transmitted its formal Response to the FFA. AR 200019. The Response stated that no correction was needed as to any of FFA's requests. AR 200019.

On April 1, 2009, FFA appealed FWS's denial of its Request (the "Appeal") pursuant to FWS IQA Guidelines, alleging deficiencies in FWS's Response. On April 27, 2009, FWS sent an interim response letter to FFA, acknowledging receipt of the Appeal on April 1, 2009 and advising that, although the IQA Guidelines provide that the Acting Director has sixty days to respond to an Appeal, due to the "series of complex scientific and legal issues" raised in the Appeal, the final determination may not be completed within that time. AR 800361.

On May 18, 2009, FFA sent correspondence to FWS regarding the discovery by another organization that FWS did not possess certain data sets on which it relied in preparing the 2008 Biological Opinion. AR 800364. On June 8, 2009, FWS responded, indicating that the agency viewed FFA's May 18, 2009 correspondence as a supplemental request for correction, which is not provided for under the IQA, and would treat it as a revised appeal (which also is not provided for under the IQA), extending the FWS's time to decide FFA's Appeal by another 60 days. AR 800371. On June 11, 2009, FFA responded, disputing the FWS's classification of the May 18, 2009 letter as a revised appeal and offering to withdraw the letter. AR 800373.

FFA filed this lawsuit on July 10, 2009, claiming FWS:

(1) Failed to comply with the IQA, the IQA Guidelines, and the ESA in promulgating the 2008 Biological Opinion;

(2) Was unreasonably delaying responding to FFA's IQA Appeal; and

(3) Failed to conduct an adequate peer review of the 2008 Smelt BiOp, because

the peer reviewers engaged by FWS to review the Biological Opinion did not meet NAS standards for independence. Doc. 1.

On November 20, 2009, FWS sent FFA a document entitled: "U.S. Fish and Wildlife Service's Response to the Family Farm Alliance Information Quality Act (IQA) Appeal of the Draft Effects Analysis of the Biological Opinion on the Continued Long–Term Operations of the Central Valley Project (CVP) and the State Water Project (SWP) April 1, 2009" ("Appeal Response"). AR 800460. The Appeal Response contains a report entitled "Independent Expert Panel Review of the Family Farm Alliance's Information Quality Act Request for Corrections" ("Panel Review"), conducted by Post, Buckley, Shuh & Jernigan ("PBS & J").[2] On March 16, 2010, Deputy Secretary of the Interior, David J, Hayes, sent a letter to FFA, stating Mr. Hayes's belief that FWS "fully complied" with the IQA. *See* Declaration of Brenda W. Davis, Doc. 54–2, Exhibit B.

In response, FFA sent Mr. Hayes a letter alleging that the Appeal Response was deficient and not in compliance with the IQA. *Id.,* Exhibits A and C. Among other things, FFA asserted that the Appeal Response did not respond to the actual requests contained in the Request for Correction and Appeal, and instead summarizes, repurposes, and essentially rewrites FFA's requests. *See id.* Exhibit A; *see also* Request for Correction, AR 200001–200018.

### III. *LEGAL FRAMEWORK*

#### A. *Summary Judgment.*

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is an appropriate mechanism for resolving challenges to final agency action. *See Occidental Eng' Co. v. INS,* 753 F.2d 766, 770 (9th Cir.1985).

#### B. *Information Quality Act.*

The IQA provides in its entirety:

(a) IN GENERAL.—The Director of the Office of Management and Budget shall, by not later than September 30, 2001, and with public and Federal agency involvement, issue guidelines under sections 3504(d)(1) and 3516 of title 44, United States Code, that provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies in fulfillment of the purposes and provisions of chapter 35 of title 44, United States Code, commonly referred to as the Paperwork Reduction Act.

(b) CONTENT OF GUIDELINES.— The guidelines under subsection (a) shall—

(1) apply to the sharing by Federal agencies of, and access to, information disseminated by Federal agencies; and

(2) require that each Federal agency to which the guidelines apply—

(A) issue guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by the agency, by not later than 1 year after the date of issuance of the guidelines under subsection (a);

(B) establish administrative mechanisms allowing affected persons to

---

**2.** This is not the peer review challenged in the Third Claim.

seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines issued under subsection (a); and

(C) report periodically to the Director—

(i) the number and nature of complaints received by the agency regarding the accuracy of information disseminated by the agency; and

(ii) how such complaints were handled by the agency.

Pub. L. 106–554, 114 Stat. 2763, 2763A–153–2763A–154 (2000) (codified at 44 U.S.C. § 3516). The IQA has no legislative history.

Subsection (a) mandates that the Office of Management and Budget ("OMB") issue, by no later than September 30, 2001, government-wide guidelines to ensure the "quality, objectivity, utility, and integrity of information" disseminated by federal agencies. *See* Pub. L. No. 106–554, § 515(a) (2000). The statute itself contains no substantive provisions regarding information quality, leaving the structure and design of any such requirements to OMB. Nor is there any relevant legislative history disclosing substantive Congressional intent regarding information quality.

Within one year of OMB's issuance of Guidelines, each federal agency was required to issue its own guidelines consistent with OMB's. *Id.* at § 515(b)(2)(A). OMB, the Department of the Interior, and FWS timely issued the required guidelines. *See, e.g.,* Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies, 67 Fed. Reg. 8,452 (Feb. 22, 2002) ("OMB IQA Guidelines"); Information Quality Guide-lines of the U.S. Department of the Interior, 67 Fed. Reg. 50,687 (Aug. 5, 2002) ("DOI IQA Guidelines"); FWS Information Quality Guidelines ("FWS IQA Guidelines").[3] The IQA specifically required agencies to "establish *administrative mechanisms* allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency ...." and to "report periodically" on "the number and nature of complaints received by the agency regarding the accuracy of information disseminated by the agency" and "how such complaints were handled by the agency." *Id.* at § 515(b)(2)(B) & (C) (emphasis added).

FWS's own IQA Guidelines are specific to its activities and disseminations, including biological opinions, and state that in order to ensure objectivity of information disseminated, the information will be presented in an "accurate[ ]," "clear[ ]," "complete[ ]," and "unbiased" manner. FWS IQA Guidelines III–8. In addition, FWS' IQA Guidelines require that a "preparer of a highly influential assessment or of influential information ... document the strengths and weaknesses of the data underlying the assessment/information so that the reader will understand the context for the FWS decision." FWS IQA Guidelines § VI–10.

## IV. *ANALYSIS*

A. *Threshold Issues.*

Federal Defendants argue that Plaintiff's claims fail for the following threshold reasons:

(1) Plaintiff's Second Cause of Action is Moot;

(2) There is no right to judicial review of either IQA claim at issue in this motion; and/or

---

**3.** Available at http://www.fws.gov/information quality/topics/IQAguidelines-final82307.pdf

(last visited August 11, 2010).

(3) Plaintiff has not established standing to sue.

### 1. *Second Claim for Relief is Moot.*

An issue is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). If the parties cannot obtain any effective relief, any opinion about the legality of a challenged action is advisory. *Id.* "Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 22, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (citation and quotation omitted). "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Id.* at 67, 117 S.Ct. 1055.

Here, Plaintiff's Second Claim for Relief alleges that FWS's failure to timely respond to FFA's appeal violated the IQA Guidelines' timeline for responding to such appeals and that this constitutes an "unlawful delay" under the Administrative Procedure Act ("APA"), which authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). It is undisputed that FWS responded to FFA's appeal on November 20, 2009. The only relief a court may order in an unlawful delay claim is to compel the agency to act. There is no longer any relief available to Plaintiff in connection with this claim. *See Carter v. Veterans Admin.*, 780 F.2d 1479, 1481 (9th Cir.1986).

Plaintiff rejoins that the November 20, 2009 response is insufficient to moot the Second Claim for Relief because FWS "failed to actually respond to [FFA's] Request for Correction and the subsequent IQA Appeal." Doc. 67 at 17. Specifically, Plaintiff complains that FWS "ignored the questions in the Request for Correction, repurposed some of the issues raised in that petition into general concepts, and provided generic summaries in response to the FWS's own inquiries; all of which avoided responding to the fundamental requests posed by [FFA]." *Id.* This is a challenge to the merits, substance, and sufficiency of FWS's response that goes beyond the allegation of agency delay on which the Second Claim is premised. A merits challenge to the Appeal Response has not been raised in the Complaint; FFA has not moved for leave to amend its Complaint; and the Complaint cannot be amended to avoid summary judgment because of the additional jurisdictional defects discussed below.

Plaintiffs' argument that the controversy is ongoing (and therefore not moot) because the 2008 Smelt BiOp has not been withdrawn from the public domain is unavailing. The Second Claim for Relief specifically challenges the *timing* of FWS's failure to respond to FFA's IQA Appeal. FWS responded. Any controversy over the *timing* of FWS's response is moot. *Carter*, 780 F.2d at 1481 (where only relief is to compel action which has been taken, no further relief can be provided). This claim fails as a matter of law.

### 2. *Right to Judicial Review Under the Administrative Procedure Act.*

It is undisputed that the IQA provides no private right of action.[4] A par-

---

**4.** Plaintiff is correct that the lack of "rights-creating" language in the IQA is not fatal to its claims, but FFA misunderstands the rea-

son why the absence of such language is not dispositive. Plaintiff discusses at great length

ty challenging an administrative agency's compliance with a substantive statute that lacks an internal private right of action must seek judicial review under the APA. *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Village of False Pass v. Clark,* 733 F.2d 605, 609 (9th Cir.1984) (because ESA contains no internal standard of review, APA § 706 governs review of actions brought under the ESA).

■ The APA authorizes suit by a plaintiff "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. There is a presumption of reviewability under the APA. *Shalala v. Illinois Council on Long Term Care, Inc.,* 529 U.S. 1, 44 n. 11, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000). However, the APA *expressly precludes* judicial review where: (1) any statute "precludes judicial review"; or (2) "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). If either of these exceptions is triggered, the lawsuit cannot proceed under the APA.

If neither of these exceptions applies, the APA permits judicial review of "[a]gency action made reviewable by statute and *final agency action* for which there is no other adequate remedy in a court...." 5 U.S.C. § 704. Where a statute lacks an internal judicial review provision, the "agency action made reviewable by statute" language is inapplicable, requiring the existence of a "final agency

action." "Agency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The APA requires that the agency action be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2). The Third Claim for Relief for failure to conduct an appropriate peer review of the 2008 Biological Opinion invokes § 706(2) by alleging that the peer review was conducted "without observance of procedure required by law."

a. *APA § 701(a)(2)'s Exception for Agency Action "Committed to Agency Discretion by Law" Bars Judicial Review in this Case.*

Plaintiff does not allege that any statute expressly precludes judicial review of Plaintiff's IQA claim. The issue is whether the IQA and/or its implementing guidelines, by law, commit to agency discretion the disputed agency actions challenged by Plaintiff's claims.

■ The general test for when an action is "committed to agency discretion by law" under the APA is whether there is "no law to apply." *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (internal quotation marks omitted). "Agency action is committed to the discretion of the agency by law when 'the

---

the example of the National Environmental Policy Act ("NEPA"), arguing NEPA is a procedural statute similar to the IQA for which judicial review *is* provided. Judicial review of NEPA cases is afforded *under the APA,* so long as the threshold jurisdictional requirements of the APA are satisfied. Whether those threshold requirements are satisfied with respect to the IQA claims in this case is a separate question that is not resolved by virtue of the fact that NEPA cases are reviewable

under the APA. While NEPA and the IQA may both be procedural statutes, their provisions are far from identical. NEPA contains specific statutory commands that federal agencies prepare environmental impact statements ("EIS") before undertaking "major Federal actions significantly affecting the human environment." Mandatory information must be included in every EIS as defined by statute. The IQA contains no such specific requirements.

statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." ' *Steenholdt v. FAA,* 314 F.3d 633, 638 (D.C.Cir.2003) (quoting *Heckler,* 470 U.S. at 830, 105 S.Ct. 1649). "If no 'judicially manageable standard' exists by which to judge the agency's action, meaningful judicial review is impossible and the courts are without jurisdiction to review that action." *Id.* Here, the IQA itself contains *absolutely no substantive standards,* let alone any standards relevant to the claims brought in this case concerning the timing of responses to Requests and Appeals and the makeup of peer review panels. The statute itself commits the challenged agency actions to the agency's discretion. However, even "[w]here an action is committed to absolute agency discretion by law, ... courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations." *United States v. Carpenter,* 526 F.3d 1237, 1242 (9th Cir.2008); *see also Padula v. Webster,* 822 F.2d 97, 100 (D.C.Cir.1987) ("Judicially manageable standards may be found in formal and informal policy statements and regulations as well as in statutes, but if a court examines all these possible sources and concludes that there is, in fact, 'no law to apply,' judicial review will be precluded.") (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The critical issue is: Do the agency's own regulations create meaningful standards or do they preserve the discretion afforded by the statute?

*Salt Institute v. Thompson,* 345 F.Supp.2d 589 (E.D.Va.2004), aff'd sub nom. on alternate grounds, *Salt Inst. v. Leavitt,* 440 F.3d 156 (4th Cir.2006), applied 701(a)(2) and *Steenholdt* to the IQA, finding that "[n]either the IQA nor the OMB Guidelines provide judicially manageable standards that would allow mean-

ingful judicial review to determine whether an agency properly exercised its discretion in deciding a request to correct a prior communication." With respect to the request for correction at issue in *Salt Institute:*

> [T]he guidelines provide that "[a]gencies, in making their determination of whether or not to correct information, may reject claims made in bad faith or without justification, and are required to undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved." 67 Fed. Reg. at 8458. Courts have determined that regulations containing similar language granted sufficient discretion to agencies to preclude judicial review under the APA. *See Steenholdt,* 314 F.3d at 638 (holding that agency's decision under a regulation allowing an agency to take an action "for any reason the Administration considers appropriate" is committed to agency discretion and not reviewable under APA). Judicial review of [the agency's] discretionary decisions is not available under the APA because the IQA and OMB guidelines at issue insulate the agency's determinations of when correction of information contained in informal agency statements is warranted.

*Id.* at 602–603. Do the IQA Guidelines create meaningful standards over the timing of responses and/or the makeup of a peer review panel, or do the Guidelines preserve agency discretion over these procedural matters?

### (1) *Application to the Second Claim for Relief.*

▮ The Second Claim alleges that FWS failed "to timely respond to [FFA's] appeal and/or make corrections to the 2008 Biological Opinion." Doc. 1 at 16–17. Neither the IQA itself nor the OMB Guidelines contain any relevant deadlines.

The timing provisions FFA alleges were violated are contained in FWS's own IQA Guidelines. The FWS IQA Guidelines provide a process for: (1) an initial "Request for Correction of Information"; and (2) an administrative appeal, or "Information Quality Appeal." For an initial petition, the FWS IQA Guidelines state: "FWS will review the request and issue a decision within 90 calendar days from the receipt of the challenge." FWS IQA Guidelines, Part V–6. "If the request requires more than 90 calendar days to resolve, the agency will inform the requester that more time is required, indicating the reason(s) why and providing an alternative timeline for reaching a decision." FWS IQA Guidelines, Part V–6. If the initial request is denied by FWS or if the requester is "dissatisfied with a FWS decision regarding their request," the FWS IQA Guidelines provide for an administrative appeal, and the "Director of the FWS or his/her designated representative will make the final decision on the appeal within 60 calendar days from receipt of the appeal in the FWS." FWS IQA Guidelines, Part V–8.

Notwithstanding the time period for responding to an appeal contained in Part V–8, the Guidelines state that alternative procedures may be utilized:

> The quality of the information that the FWS disseminates is always important, however, factors such as homeland security, threats to public health, statutory or court-ordered deadlines, *circumstances beyond our control, or other unforeseen events* may limit applicability of these guidelines. *The application of these factors will be determined by the Director, FWS or his/her designee which may result in a deferral, waiver, or use of alternative procedures.*

FWS IQA Guidelines Part II (emphasis added). Like the guidelines pertaining to the decision whether or not to correct information at issue in *Salt Institute,* which were completely discretionary because the agency could "mak[e] their determination of whether or not to correct information, may reject claims made in bad faith or without justification, and are required to undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved," 67 Fed. Reg. at 8458, so too Part II of the FWS IQA Guidelines consigns all matters related to application of those Guidelines, including the timing of responses, to the discretion of FWS. The FWS Guidelines prescribe a timeline for responding to Requests for Correction and Appeals, but authorize the Director or his designee to depart from the Guidelines under a wide range of circumstances, including "circumstances beyond our control or other unforeseen events." Section 701(a)(2) bars judicial review of the Second Claim for Relief because neither the IQA nor the OMB Guidelines contain substantive standards with respect to response deadlines, and FWS's own Guidelines preserve the agency's discretion with respect to its deadlines.

### (2) *Application to the Third Claim for Relief.*

 The Third Claim for Relief alleges that FWS failed to conduct an appropriate peer review of the 2008 Biological Opinion. Specifically, FFA alleges that certain members of the peer review body were not sufficiently independent because they authored papers upon which portions of the 2008 Smelt BiOp were based, were graduate students of persons whose work formed the basis of portions of the 2008 Smelt BiOp, were CALFED (a joint federal state initiative concerning the Delta) grant recipients, and/or participated in working groups whose work product was

considered by the authors of the 2008 Smelt BiOp. Doc. 1 at ¶ 60.[5]

The OMB IQA Guidelines define "quality," "utility," "objectivity," and "integrity." [6] Only the "objectivity" definition contains guidance about peer review:

"Objectivity" involves two distinct elements, presentation and substance.

a. "Objectivity" includes whether disseminated information is being presented in an accurate, clear, complete, and unbiased manner. This involves whether the information is presented within a proper context. Sometimes, in disseminating certain types of information to the public, other information must also be disseminated in order to ensure an accurate, clear, complete, and unbiased presentation. Also, the agency needs to identify the sources of the disseminated information (to the extent possible, consistent with confidentiality protections) and, in a scientific, financial, or statistical context, the supporting data and models, so that the public can assess for itself whether there may be some reason to question the objectivity of the sources. Where appropriate, data should have full, accurate, transparent documentation, and error sources affecting data quality should be identified and disclosed to users.

b. In addition, "objectivity" involves a focus on ensuring accurate, reliable, and unbiased information. In a scientific, financial, or statistical context, the original and supporting data shall be generated, and the analytic results shall be developed, using sound statistical and research methods.

i. *If data and analytic results have been subjected to formal, independent, external peer review, the information may generally be presumed to be of acceptable objectivity. However, this presumption is rebuttable based on a persuasive showing by the petitioner in a particular instance. If agency-sponsored peer review is employed to help satisfy the objectivity standard, the review process employed shall meet the general criteria for competent and credible peer review recommended by OMB–OIRA to the President's Management Council (9/20/01) ... namely, "that (a) peer reviewers be selected primarily on the basis of necessary technical expertise, (b) peer reviewers be expected to disclose to agencies prior technical/policy positions they may have taken on the issues at hand, (c) peer reviewers be expected to disclose to agencies their sources of personal and institutional funding (private or public sector), and (d) peer reviews be conducted in an open and rigorous manner."*

67 Fed. Reg. 8,459–60. This provides, generally, that peer review is one, but not the only, way to satisfy the objectivity requirement. Where peer review is employed, it "shall meet the general criteria for competent and credible peer review recommended by OMB–OIRA to the President's Management Council (9/20/01)...." The OMB–OIRA criteria are not expressed as enforceable standards. Rather, they prescribe that (a) peer reviewers be selected "primarily" on the basis of neces-

---

**5.** At oral argument, FFA mentioned a number of other complaints about the peer review process, none of which were raised in the Complaint.

**6.** Plaintiff cites these definitions as examples of judicially enforceable standards. Even assuming these are enforceable standards, they do not address the deadline issues raised by the Second Cause of Action and are therefore not discussed in connection with that claim.

sary technical expertise; (b) peer reviewers are expected to "disclose" prior technical/policy positions taken on the issues at hand, and (c) their sources of personal and institutional funding (private or public); and (d) peer reviews are to be conducted in an "open and rigorous manner." *Id.*

These criteria are not disabling as they do not call for disqualification, even where potential sources of conflict exist. The OMB–OIRA criteria only require *disclosure* to the agency of prior technical or policy positions taken on the issues under review and/or reviewers' sources of personal and institutional funding. The OMB–OIRA criteria do not create enforceable rules of conduct. Nothing in the statute or the Guidelines address the use of peer reviewers with the potential sources of conflict about which FFA complains.

FFA references the FWS IQA Guidelines at Part VI–2, which state that "FWS adheres to the OMB Memorandum (M–05–030) 'Final Information Quality Bulletin for Peer Review' dated December 16, 2004, to ensure that influential scientific information disseminated to the public is subject to peer review." For influential scientific information, the OMB IQA Bulletin for Peer Review "requires agencies to *adopt or adapt* the committee selection policies employed by the National Academy of Sciences (NAS) when selecting peer reviewers who are not government employees." *See* Doc. 61 at Ex. A (OMB Information Quality Bulletin for Peer Review) at 3.[7] The NAS Policy referenced in the OMB IQA Bulletin is entitled "Policy on Committee Composition and Balance and Conflict of Interest" [8] and contains guidance on the subject of conflicts of interest. Although the OMB IQA Bulletin for Peer Review requires each federal agency adopt or adapt the NAS Policy when disseminat-

ing influential scientific information, in a separate section entitled "Judicial Review," the Bulletin *specifically disclaims creating any right to judicial review:*

> This Bulletin is intended to improve the internal management of the executive branch, and is not intended to, and *does not, create any right or benefit, substantive or procedural, enforceable at law or in equity,* against the United States, its agencies or other entities, its officers or employees, or any other person.

OMB IQA Bulletin for Peer Review at Part XII, p. 41 (emphasis added).

*Salt Institute* held: "Judicial review of [the agency's] discretionary decisions is not available under the APA because the IQA and OMB guidelines at issue insulate the agency's determinations of when correction of information contained in informal agency statements is warranted." 345 F.Supp.2d at 603. Likewise, the OMB IQA Bulletin insulates from judicial review the agency's determinations about peer reviewers.

The IQA itself contains no standards concerning peer review, committing such matters to agency discretion. The OMB IQA Bulletin for Peer Review specifically disclaims that its contents create any enforceable rights, thereby preserving the agency's discretion to interpret and apply the OMB IQA Bulletin for Peer Review. There is "no law to apply" to Plaintiff's claim regarding the makeup of the peer review panel. Section 701(a)(2) bars judicial review of the Third Claim.

b. *Plaintiff's Arguments That Salt Institute and Other Cases Cited by Defendants Are Distinguishable.*

Plaintiff seeks to distinguish *Salt Institute* on that ground that, there, plaintiff

---

**7.** The OMB IQA Bulletin for Peer Review was published in the Federal Register. 70 Fed. Reg. 2,664 (Jan. 14, 2005).

**8.** *See* Doc. 61–2, Ex. B, available at http://www.nationalacademies.org/coi/index.html.

sought to *obtain* information from the Department of Health and Human Services under the IQA, not to *correct* allegedly erroneous information disseminated by that agency. Doc. 67 at 13. The *Salt Institute* plaintiffs alleged that the defendant agency, the National Heart, Lung and Blood Institute ("NHLBI"), violated the IQA by (1) failing to disclose certain data and methods used by a grant recipient, (2) reporting the results of that study on the NHLBI website and in medical journals, and (3) recommending that people limit their sodium intake. *Salt Institute v. Thompson,* 345 F.Supp.2d at 592–93. The second and third claims in *Salt Institute* were requests to correct erroneous information, not only requests for information. The Fourth Circuit affirmed dismissal of the claims for lack of standing, reasoning:

> By its terms, [the IQA] statute creates no legal rights in any third parties. Instead, it orders the Office of Management and Budget to draft guidelines concerning information quality and specifies what those guidelines should contain. Because the statute upon which appellants rely does not create a legal right to access to information *or to correctness,* appellants have not alleged an invasion of a legal right and, thus, have failed to establish an injury in fact sufficient to satisfy Article III.

*Salt Inst. v. Leavitt,* 440 F.3d 156, 159 (4th Cir.2006).

Federal Defendants cite a number of other cases in which courts have refused to exercise jurisdiction over IQA claims. *See In re Operation of the Missouri River Sys. Litig.,* 363 F.Supp.2d 1145, 1174 (D.Minn. 2004)[9] ("[T]he language of the IQA indicates that the Court may not review an agency's decision to deny a party's information quality complaint. The IQA does not provide for a private cause of action ...."), aff'd in part and vacated in part on other grounds, 421 F.3d 618 (8th Cir.2005); *Haas v. Gutierrez,* 2008 WL 2566634, *6 (S.D.N.Y. June 26, 2008) (same); *Americans for Safe Access v. U.S. Dep't of Health & Human Servs.,* 2007 WL 2141289, *4 (N.D.Cal. July 24, 2007), aff'd 399 Fed.Appx. 314, 2010 WL 4024989 (Oct. 14, 2010) (same).

Plaintiff argues that *Salt Institute* and these other cases are distinguishable on the ground none of them involved "final agency action" cognizable under the APA. The issuance of the 2008 Smelt BiOp is indisputably final agency action under the APA. However, whether or not Plaintiff challenges final agency action is irrelevant to the applicability of APA § 701(a)(2), which operates as a threshold bar to operation of the APA in this IQA case, regardless of the presence of "final agency action."

c. *Prime Time Int'l Co. v. Vilsack, 599 F.3d 678 (D.C. Cir. 2010) Does Not Support Assertion of Judicial Review in this Case.*

Plaintiff places great emphasis on the D.C. Circuit's recent decision in *Prime Time Int'l Co. v. Vilsack,* 599 F.3d 678 (D.C.Cir.2010), to argue that the DC Circuit has decided the IQA is judicially reviewable. The district court, in *Single Stick, Inc. v. Johanns,* 601 F.Supp.2d 307, 316 (D.D.C.2009), found that plaintiff did not have standing to pursue its claims that USDA violated the IQA by failing to correct or disclose data sources underlying its market share calculations and by failing to

---

**9.** At oral argument, Plaintiff attempted to distinguish *Missouri River* on the ground that the IQA was a "peripheral" issue in that case. Peripheral or not, the *Missouri River* decision directly addressed whether agency action under the IQA was committed to agency discretion by law barring judicial review under 5 U.S.C. § 701(a)(2).

respond to plaintiff's petition and request for reconsideration:

> To allow a plaintiff to seek review of an agency's violation of a statute, the court must examine "whether or not Congress intended to confer individual rights upon a class of beneficiaries" in enacting the statute. *Gonzaga Univ. v. Doe,* 536 U.S. 273, 285, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). "The question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries." *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). To make this determination, a court should focus on whether the statute contains "rights-creating language," *see Gonzaga Univ.,* 536 U.S. at 287, 122 S.Ct. 2268, which is language that emphasizes the individuals protected rather than simply dictating the actions an agency should take. *See Alexander v. Sandoval,* 532 U.S. 275, 289, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (holding that "[s]tatutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons' " (quoting *Sierra Club,* 451 U.S. at 294, 101 S.Ct. 1775)).
>
> The IQA *"creates no legal rights in any third party," and "does not create a legal right to access to information or to correctness." Salt Inst. v. Leavitt,* 440 F.3d 156, 159 (4th Cir.2006). Both the actual text of the statute and its implementing guidelines dictate the actions that agencies must take and do not contain "individually focused terminology." *Gonzaga Univ.,* 536 U.S. at 287, 122 S.Ct. 2268; *see* 44 U.S.C. § 3516 note ("The Director [of the Office of Management and Budget ("OMB")] shall ... issue guidelines ... that provide policy and procedural guidance to Federal agencies ..."); *see also* Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies, 67 Fed. Reg. 8452, 8458 (Feb. 22, 2002) (republication) (ordering that agencies should "[i]ssue their own information quality guidelines[,] ... [e]stablish administrative mechanisms[, and] ... report to the Director of OMB the number and nature of complaints"). The focus of the IQA is the communication between agencies and the development of internal procedures for ensuring quality of information. While the statute obligates agencies to establish a process by which individuals can alert an agency to a need for information correction to improve information quality, the statute does [not] contain any indication that individuals choosing to participate in such a process have a right to seek or correct information. *See* 67 Fed. Reg. at 8458–59. Because the IQA lacks any rights-creating language, Single Stick has no right under that statute to seek review of the USDA's actions.

*Id.* at 316.

The trial court found that plaintiff's challenge could not proceed under the APA because there was no final agency action:

> An agency action is reviewable under the APA only if the action is a final agency action. *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 61–62, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). A final agency action is one where " 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]' " *Bennett v. Spear,* 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970)). Because the IQA does not vest any party with a

right to information or to correction of information, *see Salt Inst.*, 440 F.3d at 159, the USDA's actions under the IQA did not determine Single Stick's rights or cause any legal consequence. *See Ams. for Safe Access v. HHS*, No. C 07–01049 WHA, 2007 WL 2141289, at *4 (N.D.Cal. July 24, 2007) (holding that because the IQA does not grant any legal rights, there was no legal consequence flowing from the defendant's response to the plaintiff's IQA petition). Accordingly, the USDA's lack of response was not a final agency action and cannot be reviewed under the APA. *See id.*

*Id.* at 316–317.

The D.C. Circuit affirmed dismissal of the IQA claims on an entirely different ground, based on USDA's argument, not raised below, that an exemption from the term "dissemination" used in the OMB guidelines barred plaintiff's claim:

> The Information Quality Act of 2000 provides that the Director of the Office of Management and Budget ("OMB") shall, "with public and Federal agency involvement," issue guidelines by the end of September 2001 that:
>
> > provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies in fulfillment of the purposes and provisions of chapter 35 of title 44, United States Code, commonly referred to as the Paperwork Reduction Act.
>
> 44 U.S.C. § 3516 note (a). The guidelines "apply to the sharing by Federal agencies of, and access to, information disseminated by Federal agencies," and require such agencies to "issue guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information … disseminated by the

agency." *Id.* § 3516 note (b)(1), (2)(A). Each such Federal agency shall, under the guidelines, "establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines issued under" the IQA. *Id.* § 3516 note (b)(2)(B).

The OMB Guidelines define "dissemination" as "agency initiated or sponsored distribution of information to the public." 67 Fed. Reg. at 8460. The definition excludes "distribution limited to … adjudicative processes." *Id.* On appeal, USDA points to the preamble to OMB's Guidelines:

> The exemption from the definition of "dissemination" for "adjudicative processes" is intended to exclude, from the scope of these guidelines, the findings and determinations that an agency makes in the course of adjudications involving specific parties. There are well-established procedural safeguards and rights to address the quality of adjudicatory decisions and to provide persons with an opportunity to contest decisions. These guidelines do not impose any additional requirements on agencies during adjudicative proceedings and do not provide parties to such adjudicative proceedings any additional rights of challenge or appeal.

67 Fed. Reg. at 8454. USDA's guidelines, in turn, exclude "documents prepared and released in the context of adjudicative processes." USDA Information Quality Guidelines, Definitions, § 2, supra note 4.

Prime Time sought disclosure and correction under the IQA of the data that USDA used to calculate its [ ] assessments[.] USDA never responded, and Prime Time challenges that nonres-

ponse. USDA maintains that the IQA does not mandate the issuance of information but merely instructs OMB to "provide policy and procedural guidance" for ensuring quality, utility, and integrity of information. 44 U.S.C. § 3516 note (a). Prime Time relies, however, on the provision that requires agencies to "establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency." *Id.* § (b)(2)(B). Regardless, because Congress delegated to OMB authority to develop binding guidelines implementing the IQA, we defer to OMB's reasonable construction of the statute. *See United States v. Mead,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). The IQA is silent on the meaning of "dissemination," and in defining the term OMB exercised its discretion to exclude documents prepared and distributed in the context of adjudicative proceedings. This is a permissible interpretation of the statute, *see Chevron [U.S.A., Inc. v. Natural Resources Defense Council ],* 467 U.S. [837] at 843, 104 S.Ct. 2778 [81 L.Ed.2d 694 (1984) ], and *Prime Time* does not contend otherwise. Rather, *Prime Time* attempts to avoid the consequences of the IQA exemption for adjudications on the ground it is waived because USDA did not raise it in the district court.

*Id.* 684–86 (footnotes omitted).

The issue of whether the newly raised argument should be addressed was decided affirmatively:

This court has repeatedly recognized that issues and legal theories not asserted in the district court "ordinarily will not be heard on appeal." *See, e.g., Horowitz v. Peace Corps,* 428 F.3d 271, 282 (D.C.Cir.2005).... The reasons for this rule are clear:

[O]ur procedural scheme contemplates that parties shall come to issue in the trial forum vested with authority to determine questions of fact. This is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide; it is equally essential in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence.

*Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037 (1941).

USDA did not raise the "exemption for adjudications" argument in the district court, so normally it would be forfeited. *See generally United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). However, in *Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), the Supreme Court observed:

The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. We announce no general rule. *Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, see Turner v. City of Memphis,* 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962).

*The "proper resolution [of the IQA issue] is beyond any doubt," so this court is free to reach it.* The issue involves a straightforward legal question, and both parties have fully addressed the issue on appeal. Consequently, no "injustice" will be done if we decide the issue. *Id.*

*Prime Time,* 599 F.3d at 686 (emphasis added).

FFA argues that the D.C. Circuit affirmed the dismissal on an issue other than the availability of judicial review under the IQA, which amounts to an implied finding that there is a right to judicial review under the IQA. To the contrary, the appeals court specifically concluded the underlying agency action—USDA's determination of manufacturer's assessments under the Fair and Equitable Tobacco Reform Act ("FETRA")—was an adjudicatory proceeding subject to judicial review directly under FETRA:[10]

> USDA's determination of Prime Time's assessments for three quarters of FY 2005 was an adjudication, attendant to which Prime Time had rights to an administrative appeal and judicial review. *See* 5 U.S.C. § 551(7) (defining "adjudication"); 7 U.S.C. § 518d(i), (j). Prime Time's contention that USDA violated the IQA when it did not respond to a request to disclose and correct certain information underlying the tobacco assessments thus fails.

**10.** Neither the issuance of the 2008 Smelt BiOp nor FWS's actions with respect to the peer review panel constitute adjudications under the APA, which defines "adjudication" to mean means "agency process for the formulation of an order. 5 U.S.C. § 551(7). An "order" is "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." § 551(6). The issuance of a biological opinion is, however, reviewable under the APA as "final agency action" subject to judicially manageable standards set forth in the ESA. *California Trout v. F.E.R.C.,* 572 F.3d 1003, 1011 n. 4 (9th Cir.2009).

**11.** The government petitioned for rehearing to seek a specific ruling that the IQA is not judicially reviewable. The DC Circuit issued a single page denial, which did not address judicial reviewability. *See United States v. Cote,* 51 F.3d 178, 181 (9th Cir.1995) (sum-

Accordingly ... we affirm the dismissal of the IQA challenge, although on a different ground than relied upon by the district court.

*Id.* at 686. There was no need to and that decision did not evaluate whether the IQA provided a basis for judicial review under the APA.[11] *Prime Time* does not support Plaintiff's argument that by negative inference the IQA provides a right to judicial review.[12]

### 3. *Standing.*

#### a. *Presentation of Competent Evidence.*

Federal Defendants complain that, at least as of the filing of their reply brief, Plaintiff presented no evidence demonstrating its standing. FFA erroneously insisted in its own reply/opposition that such facts only need be alleged in its complaint. *See* Doc. 67 at 5.[13] On summary judgment, FFA must establish standing to sue by "competent evidence":

> The party invoking federal jurisdiction bears the burden of establishing the[ ] elements [of standing].... Since they are not mere pleading requirements but

mary denial of a rehearing petition does not establish that the court considered and decided the issue the petition presented).

**12.** The OMB Guidelines acknowledge "[t]here are well-established procedural safeguards and rights to address the quality of adjudicatory decisions and to provide persons with an opportunity to contest decisions," and explain that "[t]hese guidelines do not impose any additional requirements on agencies during adjudicative proceedings and do not provide parties to such adjudicative proceedings any additional rights of challenge or appeal." 67 Fed. Reg. 8,454.

**13.** Plaintiff also objects that Federal Defendants' did not timely raise the issue of standing. *See* Doc. 67 at 4–5. This objection is without merit. Standing goes to subject matter jurisdiction, the absence of which can be raised "at any time" by a party or the Court. *See* Fed.R.Civ.P. 12(h)(3).

rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, [ ] on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations and quotation marks omitted).

Although two individuals filed standing affidavits on behalf of FFA in the *Delta Smelt Consolidated Cases* on December 3, 2009, those declarations were *not filed in this* case until September 7, 2010, several weeks after Plaintiff filed its reply brief in connection with these cross motions. *See* Docs. 69 & 70. The standing declarants, Joe Del Bosque and Chris Hurd, both claim to members of FFA. Both are farmers in Fresno County, and claim to have been harmed by the water export restrictions imposed by the 2008 Biological Opinion. *See id.*

■ A court has a *sua sponte* duty to examine standing in every case. *Bernhardt v. County of Los Angeles,* 279 F.3d 862, 868 (9th Cir.2002). Normally, to prevent prejudice from the late filing of these declarations, Defendants should be afforded the opportunity to respond. However, because Plaintiff's standing declarations

are insufficient as a matter of law, further briefing is unnecessary.

b. *Legal Standard Re: Standing.*

■ Standing is a judicially created doctrine that is an essential part of the case-or-controversy requirement of Article III. *Pritikin v. Dept. of Energy,* 254 F.3d 791, 796 (9th Cir.2001). "To satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Soc. v. Heckler,* 464 U.S. 67, 70, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

■ The doctrine of standing "requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). "The court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore v. Arkansas,* 495 U.S. 149 155–56, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *Schmier v. U.S. Court of Appeals for Ninth Circuit,* 279 F.3d 817, 821 (9th Cir. 2002). Standing requires three elements.

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the

independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations and quotations omitted). When a plaintiff seeks to vindicate a procedural harm, rather than a substantive right, the causation and redressibility requirements are relaxed:

> A showing of procedural injury lessens a plaintiff's burden on the last two prongs of the Article III standing inquiry, causation and redressibility. Plaintiffs alleging procedural injury must show only that they have a procedural right that, if exercised, *could* protect their concrete interests.

*Salmon Spawning & Recovery Alliance v. Gutierrez,* 545 F.3d 1220, 1226 (9th Cir. 2008) (emphasis in original) (internal citations and quotations omitted).

Where an organization or association sues on behalf of its members, that organization or association must demonstrate that: (1) its members would otherwise have standing to sue in their own right; (ii) the interests it seeks to protect are germane to the organization's purpose; and (iii) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

Standing is evaluated on a claim-by-claim basis. "A plaintiff must demonstrate standing 'for each claim he seeks to press' and for 'each form of relief sought.'" *Oregon v. Legal Servs. Corp.,* 552 F.3d 965, 969 (9th Cir.2009) (quoting *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006)). "[S]tanding is not dispensed in gross...." *Lewis v. Casey,* 518 U.S. 343,

358, n. 6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

> The actual-injury requirement would hardly serve the purpose ... of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration.

*Id.* at 357, 116 S.Ct. 2174.

### c. *Injury–In–Fact.*

*Salt Institute v. Leavitt,* 440 F.3d 156, 158–59 (4th Cir.2006), affirmed the dismissal of two IQA claims—one alleging that information was withheld in violation of the IQA and another alleging that erroneous information was released in violation of the IQA—on the ground that the IQA creates no legal right to information or its correctness and therefore that plaintiffs had no standing to sue:

> To invoke the jurisdiction of an Article III court, the plaintiffs "must have suffered an 'injury in fact.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The injury "required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Id.* at 578, 112 S.Ct. 2130 (quoting *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). The injuries alleged by appellants are the deprivation of the raw data from the studies and the asserted incorrectness in NHLBI's public statements. Although there is no general common law right to information from agencies or to informational correctness, appellants insist that these rights are conferred by the IQA ... By its terms, [the IQA] creates no legal rights in any third parties. Instead, it orders the Office of

Management and Budget to draft guidelines concerning information quality and specifies what those guidelines should contain. *Because the statute upon which appellants rely does not create a legal right to access to information or to correctness, appellants have not alleged an invasion of a legal right and, thus, have failed to establish an injury in fact sufficient to satisfy Article III.*

*Id.* at 158–59 (emphasis added) (footnotes omitted). FFA's contention that assertion of an informational injury is sufficient was specifically rejected:

Against this conclusion, appellants argue that the Supreme Court recognized the sufficiency of informational injuries in *Federal Election Commission v. Akins,* 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998). *However, in relying upon* Akins, *appellants confuse two distinct standing inquiries: the concreteness of the alleged injury and the status of the claimed right.* In *Akins,* the Supreme Court held that an informational injury was "sufficiently concrete and specific" to satisfy Article III. *Id.* at 25, 118 S.Ct. 1777. *In this case, we have not decided (and need not decide) the question whether appellants' alleged injury is sufficiently concrete and specific. Rather, we have decided the antecedent question whether Congress has granted a legal right to the information in question.* Akins *controls the former question, but not the latter. Indeed, on the latter question,* Akins *is distinguishable because the statute in question there, the Federal Election Campaign Act of 1971, clearly created a right to information by requiring the Federal Election Commission to make certain information available to the public. See* 2 U.S.C. § 434(a)(11)(B) ("The Commission shall make a designation, statement, report, or notification that is filed with the Commission under this Act available for inspection by the public."). *The IQA, by contrast, does not create any legal right to information or its correctness.*

Because the statute upon which appellants rely does not grant the rights that appellants claim were invaded, appellants cannot establish an injury in fact and, therefore, lack Article III standing to pursue their case in the federal courts.

*Id.* at 159 (emphasis added) (footnotes omitted).

■ *Salt Institute's* reasoning is sound. "The injury required by Article III can exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Edwards v. First Am. Corp.,* 610 F.3d 514, 517 (9th Cir.2010) (quoting *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). The IQA creates no enforceable legal rights at all, as the OMB and FWS Guidelines contain no judicially manageable standards relevant to Plaintiff's claims. There is no standing. Subject matter jurisdiction over Plaintiff's IQA claims is absent because no statutes or regulations create the rights FFA claims were violated.

### B. *Merits of Third Claim for relief.*

FFA alleges that FWS violated the IQA when it commissioned an outside peer review of the October 2008 draft Biological Opinion, because two members of that peer review had either conducted research on the delta smelt previously, or had mentorship connections with scientists who had done so, or had allegedly accepted grants from the agencies responsible for the Biological Opinion, and were not sufficiently "independent" for purposes of the IQA. Doc. 54–1 at 21–25. Because there are multiple threshold jurisdictional bars to judicial review of FFA's claims, it is unnecessary to discuss the merits of the Third Claim for Relief in detail.

*Arguendo*, reviewing this claim on the merits, the OMB's IQA Bulletin for Peer Review, which incorporates the NAS Peer Review Policy, and which is in turn incorporated by reference into FWS's IQA Guidelines, specifically disclaims creating any rights enforceable against the United States. OMB IQA Bulletin for Peer Review at Part XII, p. 41 (emphasis added). The Third Claim fails as a matter of law.

## C. *Certification of Partial Judgment.*

Rule 54(b) "permits a district court to enter separate final judgment on any claim or counterclaim, after making an express determination that there is no just reason for delay. This power is largely discretionary, to be exercised in light of judicial administrative interests as well as the equities involved, and giving due weight to the historic federal policy against piecemeal appeals." *Reiter v. Cooper*, 507 U.S. 258, 265, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) (internal citations and quotations omitted). Rule 54(b) should be applied using a "pragmatic approach focusing on severability and efficient judicial administration." *Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir.1987). Certification under Rule 54(b) may be appropriate where the matters disposed of are "sufficiently severable factually and legally from the remaining matters," and could "completely extinguish [ ] ... liability." *Id.*

The Second and Third Claims, which raise procedural challenges under FWS's IQA Guidelines related to the timing of responses to an IQA Appeal and the makeup of the peer review panel that reviewed the BiOp, are legally distinct from the First Claim, which directly challenges the quality of the science applied in the BiOp itself and is being separately decided. There is no reason to defer entry of judgment on these claims.

## V. *CONCLUSION*

For the reasons stated above, Federal Defendants' motion for summary judgment on the Second and Third Claims is GRANTED; Plaintiff's cross-motion as to these claims is DENIED. The First claim has been severed for decision with the Consolidated Delta Smelt cases.

Pursuant to Federal Rule of Civil Procedure 54(b), there is no just reason to delay entry of judgment as to the Second and Third Claims. Partial final judgment will be entered for Defendants and against Plaintiffs as to the Second and Third Claims.

Federal Defendants shall submit a form of order consistent with this memorandum decision within five (5) days following electronic service of this decision.

SO ORDERED